Welcome to our afternoon session today. Ms. Watson, will you please call the next case. Alright, will counsel who plan to argue please approach the podium. Alright, starting with the appellant, could you identify yourself and tell us who you represent. My name is Franklin Shore and I represent the complainant, appellant, Simone Wells. Alright, counsel. My name is Kendall Coates and I represent respondent, appellee at the Christ Medical Center. Alright, Christ. This is Attorney General Aaron Dozman and I represent all these state respondents. Alright, and I will tell you that the microphone in front of you is not for amplification. It's solely for recording. So if when you're presenting your arguments you could keep your voice up so that everybody in the courtroom can hear you, we would appreciate that. And I'd also tell you that we've all read the briefs. We are very familiar with the facts and the record. So with that in mind, on behalf of Ms. Wells, how much time would you like? As I understand it, I could have 20 minutes and then 10 for rebuttal. We're flexible. So 20 and 10? You want 10 for rebuttal? It's a long time. We won't. If you're going on too long, we'll let you know. On behalf of Christ, how much time would you like? 10 minutes each? Okay, great. Alright, please have a seat and on behalf of Ms. Wells, please proceed. I'm very pleased to court. As I indicated, my name is Frank Schwerin. With me on the briefs is Eleanor Samuels, who is preparing for a jury trial, so he's not suited up. I'd like to first discuss the rush to judgment that was perpetrated against Ms. Wells. Ms. Wells is African American. She was terminated in April of 2006. She had worked for Advocate since 2003. The ostensible reason was that she had failed to answer or respond to certain voicemails. That was part of her responsibilities, as was true of three other people. Wasn't that her primary job responsibility? I mean, she's a patient account specialist. Her job is to respond to patient account inquiries, right? It was certainly one of them. Her other duties were to keep track of payment plans and to record those payment plans. But, yeah, that was part of her duties. However, as we pointed out, it wasn't her duty on the afternoon that she was accused of failing to respond to voicemails. As we've shown in the documents, that responsibility belonged to a woman named Chantelle Green. Now, I should say Ms. Wells was supervised by Sharon Clifford, who also supervised Karen Bodish, Xavier Perez, and Chantelle Green. And as the document shows, Chantelle Green's responsibility, because a memo that Ms. Clifford had sent out, it was an email actually, said that Simona, Ms. Wells, was responsible for responding to voicemails, one, after 3 o'clock, and two, when Chantelle Green had left for the day. Well, Chantelle Green was there. She had not left for the day, so it wasn't Ms. Wells' responsibility. She was training in another department, right? No. They were all patient account specialists. Okay. I thought I saw that on the record, that she was training in another department. Yes, she was training in another department, but as the document shows, she was in the department that day. She was assigned to the department, and her duties that day were to respond to voicemails. Now, when Ms. Wells was asked about these voicemails the day after, she didn't say, oh, that was Chantelle Green's job. She said, I was too busy, right? That's what she did say. That's right. And she did say she was too busy. What she actually said was that she tried to answer, there were none, and then the phone started to ring, and then she was too busy. She didn't say that it wasn't my responsibility. It wasn't her responsibility because Ms. Green was training in a different department. She wasn't there. She actually wasn't there after death. The message was that she was retrieving voicemails on Wednesdays between 3 and 4 p.m. after Green had left for the day. But left for the day is ambiguous in that she was gone those afternoons because she was being trained in another department. It's not that she went home. No, that's true. But the record doesn't show that she wasn't there. I have to say, I don't know. The point is that it was never raised by her as the issue being that Ms. Green was there to answer her own phone. If that was the basis, then Ms. Wells would have expected to say something, but she never mentioned it. No, she never did, but I think one has to take into consideration that here is a woman who, in her mind, has been unfairly disciplined, and she's not a lawyer, and she didn't say everything perhaps that I would have said if I had been there representing her. She didn't say that. She said she was too busy. But that doesn't mean that there shouldn't have been an investigation. And what I want to also stress is the rush to judgment. First, her supervisor, Ms. Clifford, said she refused to answer. She didn't answer seven voicemail messages. She didn't respond. It wasn't answering. It was retrieving them. Retrieving. There was also a memo that those that came in after 3 o'clock and then it was changed to 2 o'clock could be responded to the next day, right on the next day. The issue was they weren't retrieved. Nobody retrieved them. Not that day. Right. That's true, but... And by... Well, when did Ms. Clifford come and talk to her? 4 in the afternoon the following day? When did she come and talk to her? 10. 10.30. Oh, okay. So... 10.30 the following day. By 10.30 the following day, she had neither retrieved nor responded to those voicemail messages. She didn't come in till noon. She worked from noon to 4. Right. So when did the supervisor come and talk to her? I said 10.10. It had to be between noon and 4, right? My recollection from the record was it was during the afternoon. Now I'm not sure. I think it was... I thought it was 10.30. I'd have to look at the record. 10.53. But, yeah, that's right. So, anyway, she did come in. She was there before noon, I guess. Yeah. I did say 10.53 in the brief. And at that time, all of the voicemails that could be responded to had been. And it wasn't sent. By somebody else. Yeah. Right. Yes, by somebody else. That's right. Right. Again, there's a rush to judgment, which I think is circumstantial evidence that Miss Clifford wanted to get rid of her. There is a termination policy that Advocate had, although he still has, that calls for probation before firing a person. Probation without pay. And they had a cause... To do an investigation, right? Pardon me? To do an investigation. Right, right. It's as though when somebody is at a level four under Advocate's discipline policy, that the next step is we're going to place you on probation without pay. The next step after a level four is termination, right? No, I think it's a level three. And then the next step is termination. And that's when probation is to kick in. So the next step would be level four. I don't think they call it level four, but... Yeah, it's... I don't think that they call it level four. It's just a recognition. Right. I guess I'm trying to understand, is your argument that she was entitled to be placed on probation without pay before she was terminated? Yes. Why? Where is that in the policy? That's in the termination policy. Can you quote it, or would you... I think so. No, I... Yes, I can. That is cool. All right. Thank you. Please go ahead. Okay, thanks. And as I have indicated, there was a few mistakes. One, in my judgment, it was not her responsibility. Two, there were only two out of the seven that came in before 2 o'clock, and it could be responded to then, or had to be responded to. And although it was posted in there after David said it was three, it was actually two. And... Do you argue that in your brief? I don't remember seeing that. Yeah. That it was two voicemails? I remember the argument that Ms. Clifford said it was seven, and it was really only three. I don't remember you arguing factually that it was just three. That's what she said in her affidavit, it was three. Right. I believe I argued that, that it was two. But whether it was two or three, I don't think that should be dispositive. Because the facts are, there was no investigation. And there should have been. There should have been an investigation. What did they need to, what would the investigation have consisted of? Well, to look at the document in the record to show what should have been responded to or what could have been responded to. What document are you referring to? There was an e-mail to Ms. Clifford from the woman who actually came in and responded to the e-mails. It's in there. I could find that, too. And the next thing I'd like to highlight, if there are no more questions on this subject, is the ALJ's determination that the imposition of discipline for not properly keeping track of 18 patient accounts couldn't be considered because they occurred more than 180 days. And in that regard, there's two cases. I could not find the mill in those cases. But the U.S. Supreme Court, the National Railroad Passenger Corporation said, and that was cited with approval by a Southern Circuit case, the orthopedic mill said that although you cannot recover for things that happened over 180 days, the 180 days, anything that happened before could be evidentiary and could be considered. And the ALJ, I think, was just incorrect when he said, I can't consider that, I shouldn't consider that, based on the U.S. Supreme Court and the Seventh Circuit. And the ALJ does follow the federal Seventh Circuit cases, and certainly they follow the U.S. Supreme Court cases. Now, I think it also should be considered that Ms. Clifford became Ms. Wells' supervisor. Ms. Wells, at that time, was on a level one. And four days after Ms. Clifford became Ms. Wells' supervisor, Ms. Wells was put on a level two for five absences. She doesn't dispute that she was absent unexplained at that time. She accepted that. So what difference does it make that her fifth absence occurred four days after Sharon Clifford became her supervisor? It doesn't matter who her supervisor is if she has five absences. Well, it does matter because, as we pointed out in the brief, there were others who had far worse records than- I don't think you identified anybody who had five absences who didn't get discipline for that. No, they got discipline. But the point is that the supervisor can put on discipline pretty much at her discretion. It's not carved in stone. And we pointed out where there were other matters where others, Ms. Clifford's supervisors, who were not disciplined. People, namely Ms. Perez, who had a far worse record. As I recall, Ms. Perez never got beyond a level three. In other words, you can get to a level three as long as you don't have any other infraction for a year, then you go back to level one. So she racked up level three, but then she went a year without an infraction. So I don't see how that's comparable to your client. Well, I think it's comparable because the purpose, I believe, is to properly discipline employees if they've had problems and if they aren't performing. And I will submit, I have no cases to support this, that five absences over a one-year period is something that you look at a little more carefully. The cases talk about the employer's legitimate expectation. As long as the employer says to the employees, five unexcused absences in whatever period of time it is, is going to earn you discipline. How can the employee complain when they're disciplined? Most employers have unexcused absence policies. That's right. But the ability to put on discipline is really up to the supervisor. As we pointed out, there are other instances where there have been defalcations with employees supervised by Ms. Clifford that didn't receive any. And I'd like to get to that. I think you're talking about one instance with half Ms. Brett, but the other one. There are only two people mentioned. So she had heard, if I understand you as well, had heard something stated and assumed. No, it wasn't so much an assumption. When the 18 alleged errors were put on Ms. Wells, Ms. Clifford said, you're not the only one. And virtually simultaneously, Chantelle Green came out and explained, don't give me any more, don't send any more back to me. I just got seven handed to me. Which you assume meant Ms. Green, and I'm not sure it was Ms. Green. I thought it was someone else who came out of that meeting. I was killing Bodeish. So you assume that what Ms. Bodeish was referring to was the same type of errors, errors on the call report that Ms. Wells committed. But other than Ms. Bodeish's hearsay, how do we know that? Well, but it's admissible hearsay. I don't know that it's the seven. There's no way to tell. Discovery did not reveal that it was that. But certainly there ought to be a chance to flesh that out at a hearing. Were you diligent? Well, I tried. That gets me into another topic, and that is that the advocate has used every trick in the book to keep you from finding out exactly what happened. They're entitled to do that. But when they got a motion to compel, and the judge, it was a different judge, it was Administrative Law Judge Wentz, who gave me some relief, not the whole relief I'd asked for. I did not go back to him. I could have. Well, don't you have to before you can draw the negative inference you want us to draw? Don't you have to before you can take advantage of an evidentiary presumption that somebody destroyed a document that would hurt them, don't you have to get a ruling from the court saying there was a paper copy or there was an electronic copy that the advocate has refused to produce? And you're asking us to assume, based on the fact that they said we didn't keep it, that they're hiding something. But I think you have to take that other step. Why wouldn't you have to in order to take advantage of a negative evidentiary presumption? Well, I think Judge Wentz had had enough of me. He gave me something. It wasn't what I'd asked for. But he said, you don't need to come in on motions, and I don't have a transcript. I can tell you, he said, I did document it in a letter to the advocate's lawyer at the time. He said, work this out. And I tried to work it out, but I couldn't. So should I have gone back? Yes, if I knew then what I knew now, what I know now, especially in light of your questions. I would have, but I didn't. But I think it's fair to say that advocate's conduct after that was not only good. I'm sorry. Anybody who has a phone, please silence it. Sorry. No, that's fine. That wasn't my phone. So what the judge said is, and now we get to the call report, which in my brief I call the missing call report. And what the judge said was, produce it. You don't have to tear your system apart. But if you can get it by pushing a button, produce it. Well, but following that, one of his advocates said, oh, we just want a hard copy. We didn't retain a hard copy. That's not what the judge said. The order said it was retained in the ordinary postal business, produce it. And they said, no, we only keep a hard copy. Well, at that point, it wasn't. What's the reason that you didn't go back before the ALJ? As I said before, I think he had heard enough and he told us to work things out. And I tried to work things out. So after you tried to work things out, that's when you go back and say that I tried to work things out, and I'm sorry I have to come back before you again. But they're ignoring me. They didn't say they couldn't. They just said we didn't retain a hard copy. Well, your argument today then is that advocates did not follow the common disciplinary policies and procedures. Is that correct? Yeah. I'm not saying that they have to. Well, I think you have to. They can make a business judgment. But I'm saying this is circumstantial evidence. Well, we're talking about termination of someone. You're saying there's a company that doesn't have to follow its own policies and procedures? That you can make that discipline and you have policies and procedures in place, you don't have to follow them? I guess we just disagree on that one. Can I get a drink of water? Sure, yeah, absolutely. I don't think they disagree. Well, okay. And then I think what I'm saying is that in these cases where you're not going to get direct evidence like advocates or confessions, you look for circumstantial evidence, and this is circumstantial evidence that they didn't follow their own policies, whether they can say, well, our judgment was we didn't need to do an investigation. That's all a possible excuse. But it's just one other bit of circumstantial evidence that there, at least Ms. Clifford, is rushing to get rid of as well. What would you have gained from it other than trade union? Well, I guess I would ask why there was no investigation. I would ask why there was no termination policy followed. Why was it done every, within a few hours, why didn't somebody take a look at what Ms. Wells was being accused of and see it wasn't seven, the affidavit which came out a couple years later was that it was three. Actually, I think it was two. Justice Mason, you're right. I probably did not say it should have been two. I did say that it was shown to be three by the affidavit. What if Ms. Wells hadn't shown up for work? She's a level three and she has an unexcused absence. And any infraction under the policy, any infraction is, that's it, you're out. Would you draw the same inference if the advocate said, okay, we're going to do an investigation about why you didn't show up for work and we're going to have an exit interview with you before you leave. If they didn't do those things, but she didn't show up for work, would you still draw the same, what you say is a negative inference about the rush to judgment? Yes, I would. I would because there are all kinds of explanations. Maybe she was in an accident. Yeah, I would say that they should do at least a cursory look at the e-mail that shows what the situation is, give her more of a chance to explain if she ever comes back. Yeah, I would say that would be circumstantial evidence that Ms. Glaser, at any rate, didn't care. Uh-huh. But how does all of that say that Ms. Glaser's not great? Well, Ms. Glaser's African-American. She meets that test. She was fired. She meets that test. I think you go to circumstantial evidence and, as I called it, the rush to judgment, the fact that it wasn't considered that she didn't have 18 patient account of errors, her records should have only accounted for four, I think that's how it affects it. If you have a pattern of different treatment, and I think I can say that the different treatment and with the evidence that we have, although it doesn't establish for sure that the seven don't hand seven back to me, related to patient account of errors, and you put that together with Ms. Clifford saying you're not the only one and it happens within the same day, I think that should be considered, that there's some reason, and that's circumstantial evidence, and that's what the case is called for, and that summary decision, you take everything in favor of the respondent, and you take everything against that respondent, I mean complainant, and you take everything against the respondent, and that's what summary judgment, summary decision really is the technical term, which is like summary judgment, and there shouldn't have been a summary judgment here, there should be a hearing, there are too many open issues, I think, that require the hearing. Give me one material open issue. Well, whether Karen Olish actually had seven, and whether it is a patient account error, we know she didn't receive a level, we know she got a coaching moment, apparently I have been able to establish that those seven are patient account errors, and I've seen the call report. So if you haven't been able to do that, what would a hearing add to the summary decision? Well, I think the point is it's a basis for denying a summary decision. Well, you did the discovery, so why go ahead? You didn't have the- Well, I said in the brief, I think we have the evidence, Ms. Philford said there are others who also have patient account errors. Karen Olish comes out and says, I just had seven handed back to me. It also depends on whether it's a level one, level two. We have a situation here where there's nobody else, and I understand it was in the same situation as Ms. Wells. Actually, we don't know that. We asked for discovery as to anybody who was fired for the same reason as Ms. Wells, and Judge Brent said tell them everybody who was fired for failing to retrieve or respond to voicemail messages. And they said, well, we're not aware of anybody else. See, the ALJ said that Ms. Wells had an awful employment record. He did not take into consideration that it didn't become awful until Ms. Philford became her supervisor, and that is also circumstantial evidence. The timing that you're trying to create, Ms. Wells had a level one for failing to retrieve voicemails, and that had nothing to do with Ms. Philford, right? She then, apparently, shortly after or shortly before Ms. Clifford became her supervisor, had her fifth unexcused absence, which, according to advocate's policy, results in discipline. And so, as I said before, whether it was Sharon Clifford or her old supervisor, she still had the infraction, right? And that takes her to a level two. That takes her to a level two. And then the level three was the patient account errors, which she appealed, right? Internally, she had a hearing on that, and they said because you got a favorable review ending August 2016 or maybe I'm wrong. 2006. 2006, yeah. It's on here. It's a long time. Because you had a favorable employment review for the period ending 2006, we won't count the errors against you that were before that date. Not that they weren't made, but we won't count them against you. That left six errors, which, after her appeal, she still had a level three. She had four, actually. It was four errors. So she still got errors, and she's got a level three. Yes. And so Ms. Clifford didn't induce her to make the errors. I'm having a hard time seeing where Ms. Clifford is the main actor here that results in an inference of discrimination. But if Karen Bowditch had seven errors, which is more than four, it's not as many as 18, then approaching moment is different treatment. And maybe, at least there's no evidence, that she was at a level three. So maybe when somebody has no disciplinary record, you have a coaching moment with them, but you've got an employee who's got a disciplinary record. So I don't see how they're comparable. Well, I think they are comparable because if you're going to apply the rules, as Ms. Clifford apparently did, then you've got to treat every employee equally. You can't let some go just because they don't have any disciplinary actions. That's different treatment because once you get to the level three, then you're in line for termination for something that nobody else at Advocate has ever been fighting for. It's different treatment. And intent, according to the Supreme Court, is a fact question. Why did she give him the level three and not give Ms. Bowditch any discipline, but had a coaching moment, which is not even a slap on the wrist? But Ms. Wells had, there's nothing that says that the worse you get, the more stringent we are with applying discipline. It's just not fair. And actually, I don't think it would be fair if it were done that way. Okay. Anything else for Mr. Squarron? We'll give you rebuttal. Would you like to conclude? Well, no, I think I'll save it for rebuttal. I think the questioning has been spurt about that. There's not much more I can say than I already said. I'm not trying to be too strict. No, I understand that. And the question you raised is a valid question. Well, thank you for that, Mr. Schwartz. You don't always get that. Yeah, well, after 50-plus years, I know when it's time to say it. All right. We'll give you a rebuttal. Okay. Okay? Yes. All right. Mr. Coates. Good afternoon, and may it please the Court, again, my name is Kendall Coates, and I represent the spinal poly advocate clients medical center. Advocates position here, I think we've clearly stated in the briefs, and it's quite simple. The commission's decision should be affirmed in its entirety because the commission correctly adopted the AOJ's conclusion that there was no issue of material facts with respect to Ms. Wells' race discrimination claim, and also Ms. Wells' afforded due process. What's the family review for this Court? And so the family review, something that I mentioned in this brief, is there's no question that issues of law are decided on a de novo standard in this Court, and so there's absolutely no dispute about that. There is, I think, case law, SODA, which explains that issues of fact are to be decided or to be reviewed on a manifesto of evidence standard. And here, again, I have to point out in the brief that it's not material, because under whether the issues of fact that the AOJ determined are decided or reviewed on a manifesto of evidence standard or de novo standard, the decision is the same, but the AOJ here clearly indicated in his order that there were issues of fact that he decided and I think SODA contends that those issues of fact should be reviewed on a manifesto of evidence standard here. And that's particularly important with respect to the issue of fact that was decided regarding Ms. Wells' responsibility for checking voice emails. But that doesn't really sync with the notion that summary decision and summary judgment are really the same thing. And on summary judgment, if this were a circuit court or county case and the court looked at this record and said, I'm looking at the email and I'm looking at other evidence and I don't think it was Simona Wells' responsibility to retrieve emails on the afternoon before she was fired. I'm making that as a determination of fact. If that was material, that would be reversed on summary judgment. I don't think it's any different at the commission, is it? Well, I think certainly the case law is clear that the summary decision standard and the summary judgment standard are to be applied similarly. Now, with respect to the example you gave, I think in that situation, if it were clear that the email indicated that it was Ms. Wells' responsibility to check the voicemails, we may be finding a fact that was contrary to that, but it would be subject to overturning by this court. I think there's, again, we have to point out that there's case law that certain decisions on administrative review from the commission are to be reviewed with certain deference, and I think that it makes sense that this court would not engage in a full-fledged review de novo of the law as well as the facts given that there is an administrative procedure set up for the agent and the commission to decide these matters below. But, again, I think whether the factual findings by the AOJ are reviewed under the manifesto standard de novo, the result here is the same. I think what you're trying to get to is you're trying to get to some sort of clearly erroneous standard, which is that middle standard between manifesto weight and de novo review. But I don't think it applies here, because generally the manifesto weight, the clearly erroneous standard applies where an administrative agency has made findings of fact and they need to apply those findings of fact to the law. And when the court comes back and reviews that decision from the administrative agency, the court would apply a clearly erroneous standard, which is more a negligible standard, giving some difference, giving difference, of course, to their findings of fact, but a clear review of their findings of the law. But this is different, as Judge Mason just stated. This is more like a summary judgment, a summary decision, which the question for the court is, are there material issues of fact? If there are material issues of fact that need to be resolved, then the only way to resolve those is with an evidentiary hearing, which is what Mr. Schwartz has been asking for. And I don't know how we get around that. So please explain. Sure. And so, again, it doesn't transcend over the clearly erroneous standard with respect to the- I'm sorry, advocate doesn't? I did not argue for a clearly erroneous standard with respect to the conclusions of law that ALJ made, which include that there are no material facts which require a hearing, and so a summary judgment is appropriate out of a conclusion of law that ALJ made that ALJ clearly set out as a conclusion of law in its opinion. And so it's not advocate asking for a clearly erroneous standard on review. Again, there's a noble standard that certainly applies to the conclusions of law that ALJ made, including the legal interpretation of the facts that were found by the ALJ. Simply the facts that were found by the ALJ below, I think, SOLA does argue for those facts to be reviewed under a more deferential standard on review by this court. So why are Ms. Clifford's efforts to impose discipline on Ms. Wells after she became her supervisor not at least circumstantial evidence that Ms. Wells was terminated for something other than her failure to meet advocates' legitimate employment expectations? So I think that ALJ made the appropriate conclusion, and the commission made the appropriate conclusion that there is no circumstantial evidence that suggests that Ms. Clifford had any discriminatory animus, and that's for a number of reasons, some of which the panel has already addressed. First, the fact that Ms. Clifford became Ms. Wells' supervisor only a few days before she was issued discipline for failing to live up to the absenteeism policy, that suggests that there was no inference of discrimination that can be drawn by that. The fact is that the discipline that she received for that offense was unchallenged, undisputed, both below as well as here on the record, and there's no suggestion that the discipline that Ms. Wells received for the absenteeism was not deserved. The same goes for the remaining pieces of discipline. So with respect to the level three, for the call report errors, there is no dispute that there were errors that Ms. Wells committed and that she was appropriately disciplined for those. And so there's a dispute as to whether some errors slid on beyond a certain date, and that's something that counsel addressed, but again it remains that there's no dispute of fact that the errors were committed and that Ms. Wells was appropriately disciplined for them. Now, to add to that, with respect to the question you asked, Ms. Perez identified a potential comparator by Ms. Wells. Ms. Perez was also disciplined for a call report error, and so that was again by Ms. Clifford for the similar reason that Ms. Wells was disciplined. Ms. Perez received the same discipline. Perez was a level two because she was under a level one at the time, but again the fact that a similar discipline was issued for a similar offense and the appropriate progressive disciplinary policy was followed, again derives any reference of discrimination by Ms. Clifford. And what about Ms. Bardish? With respect to Ms. Bardish, the panel discussed the hearsay by Ms. Clifford and Ms. Bardish suggesting that there was some call report error and its advocate's position that the hearsay does not create any material dispute of fact. But moving that aside, there's no suggestion in the record that Ms. Bardish had similar disciplinary issues and was not disciplined appropriately. I want to get some of those. Ms. Bardish had I believe seven errors. Ms. Wells had three or four errors, and Ms. Wells, who was already at level two, was subsequently disciplined for those errors, and Ms. Bardish was not disciplined because she had never been disciplined before, so she receives what we refer to as some form of counseling, and yet Ms. Wells is terminated. How are they not similarly situated? Now, I apologize if I have the record confused at all here, but the hearsay related to the call report errors in Ms. Bardish,  I think that doesn't establish that there's any error that was committed by Ms. Bardish with respect to the call report. There was a coaching moment for Ms. Bardish with respect to a credit card error that was appropriately corrected, and so with respect to that issue, again, I don't think that Ms. Wells can draw any appropriate comparison between those two errors. And so with respect to Ms. Bardish, she's got the credit card issue that was appropriately resolved by a check that sent out. And so, you know, again, to the extent that Ms. Wells argues about sort of entitled Ms. Bardish to more discipline than she received, she can't draw that conclusion because there's no similar issue with respect to the call report or with respect to the fail-to-retrieve errors. They're the same kind of errors. Well, one person gets a coaching moment and the other person is terminated. There at least should have been a level one warning or a level one notice or something that Ms. Bardish felt. It seems to me that they're not being similarly treated. Well, I can't. Ms. Wells is black. Ms. Bardish is not. May I see a problem? No, I can't agree that the error that Ms. Bardish committed deserved a level one. Would you admit that it deserved a level one? I cannot. I cannot agree with that. Would it deserve a coaching moment? Why? Because she's not black. And that's certainly not the case from an advocate's perspective. The coaching moment was appropriate in that circumstance because the error that was committed was not likely to have the same level of severity. It was a failure. Failure in the presentation area. You're talking about different areas. I think you're too. You're talking about the mistake in the credit to the patient. In the presentation area. Right. Well, according to what I'm reading here, the coaching moment was for the patient account errors. And I'm reading. Let me just correct that. Ms. Wells interprets that as a patient account error and uses that language, patient account error, to draw equivalence to the career errors that Ms. Wells committed. From an advocate's perspective, the two errors were not equivalent with respect to severity and, therefore, did not deserve the same. So, therefore, one person gets to make errors and there's no discipline whatsoever. You get a coaching moment. Errors, period. You don't have to determine what kind of errors there are. As I read here, there are, in fact, patient account errors, but maybe what I'm reading is not correct. These are not my notes. I'm reading this from a brief. But, again, if one person is committing errors, another person is committing errors, if one person gets a coaching moment, another person gets terminated, I see a problem. I think it's a much different case if Ms. Wells would point to evidence that's in the record that suggests that Ms. Borges also committed the same errors that Ms. Wells committed. So whether it be with respect to attendance, a call-up point error, or a failure to check personnel, it would be a much different case if Ms. Borges committed the same error and did not receive the appropriate step-up in the level of discipline. But that's not the case here. What we have is evidence that Ms. Wells was appropriately disciplined when she received a call-up point error. She received the same one-step in advocates' professional disciplinary policy from a level one to a level two. Also with Ms. Perez, when she failed to check personnel, she was issued a level one, again, appropriate to advocates' disciplinary policy. And so we have those clear examples of the same infraction that was committed by Ms. Wells and Ms. Perez and the same level of discipline was issued. And so, again, there's no dispute that leads to the conclusion that there was no discrimination here because the same appropriate disciplinary policy was followed in each circumstance. Ms. Wells cannot point to any comparator who had the similar level of discipline, the similar step-up through advocates' progressive disciplinary policy, but did not receive discipline as she did. She can't report, she can't show that anyone is similarly situated to her in that regard, which is required in order for her to meet her punitive case. She can't show that because that was not the case. Ms. Wells was the only one who had undisputed, clear disciplinary issues that led to appropriate steps-up to the levels of the progressive disciplinary policy, and she can't point to anyone else. And so she cannot meet her punitive case, and there's no other circumstantial evidence in the record, as the commission appropriately concluded, that points to any discriminatory influence on the part of Ms. Clifford. All right. Do you want to wrap up, Mr. Coates? I will. I will briefly wrap up and allow the state to take their main time. I just want to touch briefly upon the due process arguments. Now, it's at the position that the due process issue was not appropriately raised in Ms. Wells' brief, and therefore should not be considered by this court. There was not the appropriate laying out of what the issue was with appropriate citations to the court, and so it's at this position that the due process issue should not be considered by this court. Moving all that aside, I think I left it pointed out in this brief that there's nothing from which Ms. Wells can establish that there's a procedural due process issue here. I think the record establishes that she had plaintiff's process below, and we also started to take which points out that the summary decision procedures of the IHRA are appropriate due process and consistent with due process. There's nothing in the record or there's nothing with respect to any case law that requires a hearing, either before the IHRA or before the commission, and I'll say that Ms. Wells can't point to any prejudice that she rose or injury that she suffered as a result of the proceedings below. And so there's certainly no due process violation here, and lastly, it's at this position that if the court were to find that any remand was required, that Ms. Wells cannot point to any reason why the remand should not go back before the commission. There's an argument in Ms. Wells' brief that there should be some independent arbiter. Ms. Wells did not point out who that would be or why. What authority we would have to order it. Correct. And so I think the commission is appropriately equipped to handle that, and I'll be at the time of submission unless the panel has any further questions. All right. Thank you, Mr. Koch. Thank you. Mr. Dozman. Hey, police and court. I'm Assistant Attorney General Aaron Dozman. I represent the state respondents. So how does it take eight years to get from the filing of a complaint to a decision? I have a couple of responses to that question, Your Honor. And first, as we mentioned in our brief, the argument based on that is forfeit. It has nothing to do with the merits. There's no prejudice resulting from any delay. Apart from the law, I'm just curious. Yes. Apart from the record, I can say a few things. First, an 1,800-page record is a comparatively large record for these cases, especially where there is no transcript because it didn't go to a hearing. Secondly, it was contentiously litigated at every stage. And during the time when the exceptions were filed in 2013 and 2014, there was one newly hired attorney who was responsible for reviewing all these cases. Is that in the record anywhere? No, but I think the Commission's lack of resources over the last decade, I think, is no mystery. There are executive orders about it. There are Senate resolutions about the Commission's backlog of cases. And it's just an under-resourced agency. And that's the kind of caseload they have. Also, they have these exceptions cases, which are when you file an exception to an ALJ decision. And then they also have requests for review, which are reviews of a department, the Human Rights Department's dismissal of someone's charges. So the Human Rights Department not bringing someone's charges before the Commission. And those number in the upwards of 1,000 a year that are pending. So the caseload is significant. The staff they have, the resources they have, are not sufficient to address these things as quickly as they want. And there are ways we're going to try to address this. They know that it is an issue. But that's all I can really say about why this might have taken the time it did. But that is apart from the merits. And on the merits, under any method for analyzing a race discrimination claim, the undisputed facts here just do not show that race was a motivating factor in terminating wells. She was fired based on her job performance for not retrieving these voicemails. Her disciplinary history was well documented. It placed her at risk of being terminated for her next infraction. And Advocate did follow those policies and procedures. What about Mr. Swearen's ruster judgment argument? She discovered the unretrieved voicemails, and one day she's fired the next. And she doesn't have an exit interview. Well, first with regard to the claim that she needs to be suspended, I don't think that's accurate. The policy says on 252 of the record, suspension is not one of the corrective action steps, nor is it to be punitive in nature. So suspension wasn't on the table. It's pretty clear that termination would follow after level three. So regarding the rush to judgment, I think the face of the notice of termination shows that they're well-meaning. The fact that they had before them, the fact that Clifford had, was that another employee had brought seven heirs to Ms. Clifford in an email. That email is in the record. And there were seven voicemails that were unretrieved. Her name is Donna Kirby. She mailed Clifford their seven heirs. Clifford thought that the seven voicemails were all attributable to Ms. Wells. So on the termination, it references that they met. On the day of her termination, they discussed this, and her only response to Ms. Clifford's allegation that she had not checked the voicemails was that Wells misunderstood her email from February, that she was only responsible for checking voicemails on Fridays. And I looked at the email. It's pretty clear what the email says. That's also quoted in the notice of termination. And even if there were confusion over how many voicemails it was or the degree of the infraction that it was, it's obvious that Clifford believed that Wells was responsible for those seven unchecked voicemails. Wells did not contest that she was responsible for checking them, and that was the reason for the termination. And that's not a race-based decision. And there's no way to infer there was some racial motivation based on those facts, even accepting that there might have been confusion over how many voicemails were unchecked. I'd like to ask a different issue. Ms. Wells' counsel in her flag break talks about how the order or decision by the administrative law judge contained numerous comments that could be taken as bias. That is, calling Ms. Wells' protest self-serving. He stated that Ms. Wells had an awful disciplinary history. I don't know if the word awful would describe this particular disciplinary history. Calls her claims quibbles or adherence and so forth, woefully untimely. These adjectives that are used don't seem to be appropriate in making a determination of this type of hearing. Do you have any response to that? I don't think that those comments reveal any bias. I think they reveal, if anything, it's about the merits of the claim. The parties presented a very substantial record to the ALJ. The ALJ is a writer, and I'm sure have, after reviewing the evidence and opinion of the case, but in any event, the standard of review is de novo, and this Court can look beyond the linguistic flourishments of the ALJ and see what the undisputed facts were and whether the advocate was entitled to judgment as a matter of law on those undisputed facts. Relatedly, I have one point on the standard of review. Our position of standard of review, like for some judgment, is de novo, because it is based on the undisputed facts, so the ALJ or the Commission has no opportunity to make a factual finding. If a fact is disputed, then that requires hearing. So it's all about the undisputed facts that entitle one of the parties to judgment as a matter of law. Also, the Solow decision, where I think it was the first case to really clarify what the standard of review is in summary decision cases, it does have a confusing sentence. In the same sentence, it talks about a manifest way for factual findings and de novo for legal conclusions. I don't know if that decision actually involved the appeal of something else that required factual decisions, but I see where that confusion might come from in Solow. But just like summary judgment, we treat it as the review is de novo. So based on the substantial records in this case, I do also want to note that, I would like to point out the responsibility of who was supposed to retrieve voicemail messages, whether it was Green or whether it was Wells responsible for that. And to the extent that there was confusion, Clifford believed that it was Wells' responsibility. Wells apparently believed that because her excuse was when she met with Clifford was, oh, I thought I was only responsible for Fridays, I thought your email was unclear. So the three pieces of evidence that Wells has identified. Is that a fact that's in dispute? I don't think that's a fact that's in dispute, a material fact, because either way you cut it, I don't think we can infer a racially motivated decision from the confusion over who might have been responsible for checking voicemails or what time frame on Wednesdays who was responsible for checking them and Green was responsible for checking them. So viewed together individually as a whole, none of the evidence that Wells points to on review really, we can't really infer race discrimination from them. And it's also important to note that Wells accepts the undisputed facts as they're set out, but she wants to draw a different inference from those facts, not that the facts are wrong, it's just she wants to infer them differently, but that is speculation and speculation, we know, never defeats a summary decision. The only conclusion from this record is that Wells was fired based on her job performance for not retrieving voicemails, as was her job. She was already on a level three disciplinary infraction, which put her on notice that she would be fired for the fourth infraction. If the court has no further questions for the commission, we ask that you affirm the decision. All right, thank you. Thank you, Mr. Grosman. Mr. Schwerin. Well, I'm trying to put myself in Ms. Wells' shoes, and I can't really do that because I'm not a black woman in what's pretty much a clerical job, but to expect her to come up with all the legal defenses when she's on the verge of being fired and she at least thinks that there's been racial discrimination, I can't say I would have done any better. But I think what Mr. Dozman's point is, leave what Ms. Wells said or thought on the side, because it's really not her perception that drives the inference of discrimination. There's nothing on the other side to say that Ms. Clifford did not believe it was Simona Wells' responsibility to retrieve voicemails on that afternoon, that she wasn't making it up. And so when Ms. Clifford says, well, that was your job and you didn't do it, how can we infer that race entered into that? Because we don't have anything to counter that she didn't really believe that. Well, there's no way for me to tell without cross-examination as to what she agreed with. By the way, she did not say with respect to the missing call report, she said something, I think the words were, I don't recall anyone else being on that. See, that's another, you know, you want us to draw an inference from that when you didn't really tee that up before the ALJ. I mean, the way to tee that up is to say, Judge Brent, they say they didn't retain a paper copy. That doesn't tell me whether they can't push a button and retrieve it electronically. And unless they're willing to file an affidavit that says, without dismantling our entire computer system, we cannot obtain a copy of that call report. If they're not willing to provide you that affidavit, then I want you to draw a negative inference from that. But, you know, you kind of stop short of that by just accepting her affidavit that says, I don't recall if there was anybody else on the call report who had mistakes. Well, I did tee that up before the commission. I think it also ought to be considered that I didn't get a hearing, I didn't get to stand in front of the ALJ. I did not get to stand in front of the commission. As long as we're going outside the record on the resources of the commission, I can tell you that when I went in before the chief judge, the chief ALJ, and asked that the case be assigned to another judge, and I said, it's been sitting for over three years and there's no decision, he said, oh, that is embarrassing. And I can't prove it, but I am sure that this case was swept under the rug. You know, it's one thing to say that the delay in resolving an issue case is embarrassing. It's another thing to say that the ALJ was dishonest in its review of the record. I don't think there's any way. The ALJ, the new ALJ, the chief ALJ, may have been embarrassed about the delay, but that doesn't counsel to say, well, we have to rule in favor of advocate now because it's been so long. I just don't draw that inference. Well, you know, I can't talk you out of that, but I do know. It's your job. Try. Well, when the government says let's get rid of the commission in the same month that the decision comes down, that tells me that there's an underlying reason. I don't know if it's dishonest, but I can tell you in here, I know that that had something to do with it. And I think as a person who has seen things work over 50-some years, I don't think I'm off the wall in saying they wanted to get rid of this case. It was not eight years. It was nine years old. And so all we have to do is say reaffirm. As far as ALJ Bodia goes, I don't know what his directions were, but I do think that it would make sense at the very least to have a different ALJ assuming you overturn the decision of the commission, to have a different ALJ. And actually, I think it would make sense. And I think you do have an authority to order that it be done by somebody other. Who? Who? Who? Somewhere? Who? How? What's the action that gives us the authority to say, no, we want you, sir. Well, I can make some suggestions. One would be the chief counsel of the Department of Human Rights, which found there to be probable cause of racial discrimination. So you just like a more hospitable forum. Yeah. Yes, I do. But I'd like one. I'd like one that I don't think is predisposed to rule against me. I could be wrong. I've been wrong before. But I think that that would make sense under these circumstances. And again, I would say, what's Ms. Wells supposed to do? She's called in. She's fine. She says, I was too busy. She doesn't get a chance to look at any of the documents. What's a person to do in that situation? And I shouldn't be asking questions. Take it as a rhetorical question. What was she supposed to do under these circumstances? I'm asking myself, not the courts. All right. Thank you for your attention. Thank you all for your briefs in this matter and your arguments here today. We will take the matter under advisement. It will not be eight years. And we will decide the case accordingly. Thank you.